Arthur **ROHMAN** and Jevne Shepherd Rohman, as Co-trustees of Ida S. Shepherd Trust, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 16423.

United States Court of Appeals Ninth Circuit.

Feb. 10, 1960.

Flint & MacKay, Edward L. Compton, Jr., Los Angeles, Cal., for appellant.

Charles K. Rice, Asst. Atty. Gen., Charles B. E. Freeman, Harry Baum, Lloyd J. Keno, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Robert H. Wyshak, Eugene N. Sherman, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS and BARNES, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge.

In 1907, 13 persons bought a piece of real estate from John Widney, who conveyed the property in trust to Title Insurance & Trust Company. The seller, purchasers, and trust company joined in a declaration of trust, which designated Widney as "payee", the purchasers as "beneficiaries," and the trust company as "trustee." It recited that the balance of the purchase price in the amount of $45,000 was payable at the rate of $15,000 a year for the succeeding three years, and provided in part:

· "That the said trustee holds and will hold said property for the purpose of securing to the said payee the said deferred payments as above provided; and for the purpose of renting and selling the same; the sale price thereof to be not less than $90,000.00."

The agreement provided that upon sale of the property, the trustee should receive 1/10th of one percent of the selling price, "which fee shall be for the first year of the life of this trust, and shall, in no event be less than $90.00. Should this trust not terminate within one year from the date hereof, then the said trustee shall receive an additional sum of $25.00 for each year, or fraction of year thereafter." It further provided for "reasonable compensation for any extraordinary service performed" by the trustee.

After providing for disbursement of the "proceeds of the sale of the property", the trust instrument prescribes in detail the procedure to be followed in the event of default in payment of the balance of the purchase price, followed by these provisions:

"The said Trustee may, in its discretion, appoint S. J. White, * * * or such other person or persons as it may deem best, as its Agent for the sale of said property, to collect and disburse rents thereof, and to generally assume the care and custody of said property, but the said Trustee shall not be liable to any person for any default, defalcation or wrongdoing of any Agent.

"It Is Understood and Agreed that the said trustee will act in all matters in connection with this Trust, requiring the consent of the Beneficiaries hereunder, upon the written order and direction of at least a majority in Interest of said Beneficiaries hereunder; which written order and direction of at least a majority in Interest of the Beneficiaries hereunder shall be considered, so far as the said Trustee is concerned, the written order and direction of all of said Beneficiaries.

"The said Trustee shall not be required to attend to or procure any insurance upon the buildings upon the said property, or to pay or attend to the paying of any taxes or assessments levied or assessed against the said property so long as this Trust shall continue, or to collect or disburse any rents thereof, but all such services shall be performed and the expenses thereof borne by the said Beneficiaries, or their representatives."

One of the original purchasers testified that they intended to sell the prop-

erty within the year, but did not do so. Instead the property was rented as a parking lot to different tenants from 1907 to 1956. The property was never improved or developed. No parcel was sold and no other property was acquired.

Pursuant to the trust instrument, S. J. White, one of the beneficiaries, was employed to manage the property. Upon his retirement the managerial duties were performed by one or more of the other beneficiaries. The beneficiaries negotiated all leases and determined the provisions thereof, including the term and rental. The trustee executed the leases pursuant to the written request of the beneficiaries holding a majority interest in the trust. In the original lease all the beneficiaries signified their approval in writing on the lease instrument. Prior to leasing the property it was necessary for the beneficiaries to contribute to the payment of taxes and interest. Their contributions were collected by White and delivered to the trustee, who paid the taxes and interest pursuant to White's written request. All rents were collected by White or one of the other beneficiaries, and delivered to the trustee. All inquiries regarding the property were referred by the trustee to the beneficiaries, who discussed the possible sale of the property with prospective buyers and fixed the price and terms of purchase.

The trustee held title to the property until 1956 when the trust was liquidated. At the time of liquidation, the sole beneficiaries were Arthur Rohman and Jevne Shepherd Rohman, as co-trustees of the Ida S. Shepherd Trust, the Shepherd Trust having acquired complete ownership in 1955.

The trustee of the Widney trust filed federal corporation income tax returns for 1949 through 1956, and corporate income taxes and interest were paid. Timely claims for refund were filed by the appellants.

The primary question is whether the Widney Trust was an "association" taxable as a corporation under § 3797(a) (3) of the Internal Revenue Code of 1939 [1] and § 7701(a) (3) of the Internal Revenue Code of 1954, as found by the trial court.

■■■ Congress has power to tax as a corporation an unincorporated association in the form of a trust which transacts its business as if it were incorporated. To tax a trust as an association, (1) there must be associates who have entered into a joint enterprise; (2) the trust must have a "business purpose"; and (3) there must be substantial resemblance to a corporation.[2] The "salient features" in determining whether there is a substantial resemblance to a corporation are (1) title vested in a

---

1. The relevant part of § 3797(a) (3) reads:

  "(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

  *   *   *   *   *

  "(3) Corporation. The term 'corporation' includes associations, joint-stock companies, and insurance companies." (26 U.S.C. 1952 ed., § 3797).

  Section 7701(a) (3) of the Int.Rev.Code of 1954 (26 U.S.C. 1958 ed., § 7701) is identical.

2. These tests are set forth in detail in Morrissey v. Commissioner, 1935, 296 U.S. 344, 56 S.Ct. 289, 295, 80 L.Ed. 263. The following excerpts from the opinion are pertinent:

  "3. 'Association' implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. This is not the characteristic of an ordinary trust—whether created by will, deed, or declaration—by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, for the benefit of named or described persons. *   *   * In what are called 'business trusts' the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains. Thus a trust may be created as a convenient method by which persons become associated for dealings in real estate, the development of tracts of land, the construction of improvements, and the purchase, management and sale of properties; *   *   * or for commerce, or other sorts of busi-

single entity; (2) centralized management; (3) continuity; (4) transfer of beneficial interests; and (5) limitation of personal liability.[3]

It is the contention of the Government (1) that the recital in the lease that the trustee will hold the property for the purpose of securing the deferred payments and "for the purpose of renting and selling the same" expressly stated a "business purpose"; that the purpose of the trust must be determined from the trust instrument; that "the activities of the parties under the trust show that the trust had a business purpose"; and (2) that the trust possessed features resembling a corporation. Appellants contend (1) that the holding of a single piece of unimproved property for sale and the rental thereof to a single tenant without any managerial service being performed by the trustee are insufficient to satisfy the "business purpose" test; and (2) that the trust did not possess the characteristics of a corporation in that (a) the trust instrument did not provide for the transferability of the interests of beneficiaries; (b) limited liability was disclaimed under the terms of the trust; and (c) the trust did not have "centralized management."

■■ In our opinion the trust instrument meets the tests of "transferability of interests"[4] and "limited liability."[5] Does it satisfy the requirements of "business purpose" and "centralized management"? In other words, was the trust engaged in carrying on a business enterprise for profit, with management in the trustee analogous to that in the board of directors of a corporation? While the parties agree substantially upon the criteria for determining these requirements, they disagree upon their application to the provisions of the trust instrument and the operations pursuant thereto.

■ The test of whether a trust instrument discloses an association for the purpose of carrying on a business must be determined from the instrument itself.[6] "The parties are not at liberty to say that their purpose was other or nar-

ness; where those who become beneficially interested, either by joining in the plan at the outset, or by later participation according to the terms of the arrangement, seek to share the advantages of a union of their interests in the common enterprise. * * *

"* * * Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise,—who act 'in much the same manner as directors,'—may provide a similar scheme, with corresponding effectiveness. * * *"

These principles are embodied in Treasury Regulations 111 promulgated under the Int.Rev.Code of 1939, Sections 29.-3797-1, 29.3797-2 and 29.3797-3; and in Treasury Regulations 118, Sections 39.-3797-1, 39.3797-2 and 39.3797-3, applicable to taxable years beginning after December 31, 1951.

3. Morrissey v. Commissioner, supra.

4. Even though the declaration of trust did not provide for certificates of beneficial interest, there was no restriction on the transferability of the interests, and the beneficial interests were in fact freely transferred.

5. While there was no express limitation of liability, the trust agreement did provide that if any beneficiary should fail to pay his proportionate share of the purchase price, all or any of the other beneficiaries had the right to advance the proportionate amount due from the defaulting beneficiary and were thereafter entitled to contributions from the defaulting beneficiary and to receive from the trustee out of funds in its hands belonging to the defaulting beneficiary, the amounts advanced with interest. This provision for proportionate liability satisfies the requirement of "limited liability." See Commissioner of Internal Revenue v. Security-First Nat. Bank, 9 Cir., 1945, 148 F.2d 937; Thrash Lease Trust v. Commissioner, 9 Cir., 1938, 99 F.2d 925. Moreover, "limitation of the beneficiary's liability is not a sine qua non of the corporate analogy." Helm & Smith Syndicate v. Commissioner, 9 Cir., 1943, 136 F.2d 440, 441.

6. Morrissey v. Commissioner, 296 U.S. 344, 357, 56 S.Ct. 289, 80 L.Ed. 263; United States v. Homecrest Tract, 9 Cir., 1947, 160 F.2d 150, and cases there cited.

rower than that which they formally set forth in the instrument under which their activities were conducted." Helvering v. Coleman-Gilbert, 296 U.S. 369, 374, 56 S.Ct. 285, 287, 80 L.Ed. 278.

While the declaration of trust involved in this action recites that one of the purposes is "renting and selling the property," other provisions limit and qualify this general statement. The provision for the trustee's compensation is hardly consistent with the operation of the trust property as a business, but rather implies the holding of the property for sale. While the trust instrument provides that the trustee may in its discretion appoint White or some other person as its agent to handle the property, it also provides that the "trustee shall not be liable to any person for any default, defalcation or wrong-doing of any agent,"—an unusual provision for a management trust. The agreement expressly provides that the trustee shall not be required to procure insurance, pay taxes, or collect or disburse the rents, "but all such services shall be performed and the expenses thereof borne by the said beneficiaries or their representatives."

██ Even though the property was never sold and was rented for some 50 years before the trust was liquidated, the trustee did not at any time perform any managerial duties, but simply held title to the property, made the payments to the "payee" (until 1942 when the purchase price was paid in full), paid the taxes, and distributed the net income to the beneficiaries, all pursuant to written directions of one or more of the beneficiaries.

With respect to the "business purpose" test, the essential question in the case of real estate trusts, as in other trusts, is "whether the paramount purpose of the trust was the carrying on of a business enterprise for profit," [7] as disclosed by the trust instrument in its entirety. We must determine whether the powers vested in the trustee by the declaration of trust established a business purpose "beyond the traditional scope of an ordinary trust for the holding of real estate." [8] The regulations refer to an "ordinary trust" as one "created by will or by declaration of the trustees or the grantor, the trustees of which take title to the property for the purpose of protecting or conserving it as customarily required under the ordinary rules applicable in chancery and probate courts." [9]

In ordinary real estate trusts, when the estate consists of unimproved property, it is usually the duty of the trustee to lease the property prior to sale, pay taxes and any mortgage indebtedness, collect the rents, and pay the net income to the beneficiaries. The trustee does not have the power to purchase additional real estate, construct buildings on the unimproved real estate, or operate a business thereon. Nor did the trustee of the Widney Trust. The trustee was not authorized generally to deal in land or to improve or operate real estate. On this basis most of the cases on which the Government relies are distinguishable.[10] We cannot escape the conclusion

---

**7.** 7 Mertens Federal Income Taxation, § 38A.19. The general rule here applicable was well summarized as follows: "The courts have held quite uniformly that a trust devoted to the liquidation of real estate or the passive holding of real estate and the collection of income therefrom was not taxable as an association; and that a trust would be deemed to be an association if its principal object and activities involved dealing in real estate, development of tracts of land, construction of improvements, or the purchase, management, or sale of properties."

**8.** See Smith, Associations Classified as Corporations, 34 Cal.L.Rev. 461, 502 (Sept. 1946).

**9.** Treasury Regulations 111, promulgated under the Int.Rev.Code of 1939, § 29.-3797-3.

**10.** In Morrissey v. Commissioner, supra, the trustees were authorized to purchase, encumber, sell, lease and operate the "described or other lands"; to construct and operate golf courses, club houses, etc.; to make loans and investments; and generally to manage the trust estate as if the trustees were its absolute owners. In

that the trust here involved is an ordinary real estate trust rather than a trust created to operate a business.

It is necessary also that the trust meet the test of corporate resemblance, including "centralized management." In support of their contention that the trust fails to meet this test, appellants rely primarily upon Commissioner of Internal Revenue v. Gerstle, 9 Cir., 1938, 95 F.2d 587. There four syndicates were formed to purchase realty in anticipation of a general rise in values. It was recited that the syndicate members were desirous of "acting jointly in the purpose, management and, sale of real properties * * * and for that purpose have requested the syndicate managers to act as their agents and trustees." The parties agreed that the managers "should purchase, manage and sell the real properties for the account of the members, the managers to have complete discretion in the selection of the properties to be purchased, the amount of the purchase price, the details of management, the terms of sale and of mortgage, and of all other matters related to the syndicate operations." The anticipated

rise in values, as in the Widney trust, did not occur. Instead there was a decline, which continued for many years, by reason of which the syndicate managers were "compelled to operate certain of the buildings and to rent the remaining unimproved properties." In holding that the syndicates were not "associations" for tax purposes but rather "joint ventures," the court said in part: "While the agreements gave the managers broad exclusive powers, the practice was to decide all questions of importance only after the views of all concerned had been obtained."

The facts in the instant case are similar in many respects. If anything, the powers of the Widney trust were more limited. The Government argues that the Gerstle case has been distinguished in subsequent decisions of this court holding trusts taxable as associations. This is true; but the distinction has been based on the fact that in the Gerstle case there was no "governing directorate with the usual managerial functions." [11] The same is true here. There was no committee or board with managerial powers or duties; nor was

---

Helvering v. Coleman-Gilbert, supra, "the trustees were to have the 'full power and discretion' of absolute owners, with authority to invest and reinvest the trust property, including its income, * * * and 'in the purchase and improvement of real estate situated in the cities or towns of the commonwealth of Massachusetts'." (296 U.S. at page 371, 56 S.Ct. at page 286, 80 L.Ed. 278) The trust owned and operated some 20 apartment houses, with 1600 tenants. In Title Insurance & Trust Co. v. Commissioner, 9 Cir., 1938, 100 F.2d 482, 485, the trust owned and managed a large office building, and the court held that the purpose of the trust, as disclosed by the trust agreement, "was to carry on the business of owning, managing, leasing and selling real property and sharing the gains therefrom." In Helm & Smith Syndicate v. Commissioner, 9 Cir., 1943, 136 F.2d 440, 441, the trustees "had 'exclusive power to manage and control, * * * and to lease, including for oil and gas development purposes, sell or otherwise dispose or encumber the same * * *.'" In United States v. Homecrest Tract, 9 Cir., 1947, 160 F.2d 150, 152, "the trust deed pro-

vided all the powers needed to develop a real estate subdivision in any manner that might prove profitable."

11. See Helm & Smith Syndicate v. Commissioner, 9 Cir., 1943, 136 F.2d 440, 441, where there was a syndicate controlled by a committee which included a trustee and which was authorized to lease, sell and manage petroleum properties, the trust instrument granting to the committee "exclusive power to manage and control the property," and it was held that, "The provision for a governing directorate with the usual managerial functions distinguishes this case from Commissioner of Internal Revenue v. Gerstle." The same distinction was recognized in United States v. Homecrest Tract, 9 Cir., 1947, 160 F.2d 150, 152, where "the trust deed provided all the powers needed to develop a real estate subdivision in any manner that might prove profitable;" and management was centralized in a board of managers and trustee "in much the same manner as in a board of directors." See also Bloomfield Ranch v. Commissioner, 9 Cir., 1948, 167 F.2d 586.

the trustee granted managerial functions by the trust instrument. The retention of control of management by the beneficiaries negatives the existence of a "governing directorate with the usual managerial functions." [12]

In view of our conclusion that the Widney Trust failed to meet the tests of "business purpose" and "centralized management" required for taxability as an association, it is unnecessary to consider the other specifications of error.

Reversed and remanded for computation of amounts due and entry of judgment in favor of appellants.

---

12. * * * "(D)irect control of any considerable part of the details of management by the majority vote of all the beneficial owners is substantially and realistically different from the 'centralized management' described in the Morrissey and Coleman-Gilbert cases." Smith, Associations Classified as Corporations, 34 Cal.L. Rev. 461, 518. (Sept. 1946).